IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　Plaintiff,<br>vs.<br>Robert Thomas O'Donnell,<br>　　　　Defendant. | CR 06-01277-TUC-JMR (JCG)<br>**REPORT AND RECOMMENDATION** |

On June 25, 2008, the government filed under seal a Petition to Revoke Supervised Release. (Doc. No. 27.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral made on June 27, 2008, pursuant to LRCrim 5.1. (Doc. No. 29.)

Defendant's Motion was set for evidentiary hearing; evidence was heard on August 20, 2008 and closing arguments were heard on August 21, 2008. (Doc. Nos. 41, 42.) Defendant, who is not in custody, was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, GRANT the Petition to Revoke Supervised Release.

## FACTUAL FINDINGS

The government seeks to revoke Defendant's Supervised Release on the grounds that Defendant violated: (1) Special Condition 10, which prohibits use of alcohol; (2) Special Condition 11, which prohibits association with felons; and (3) Special Condition 5, which prohibits certain contact with children.

The government presented evidence through United States Probation Officer Andrea Mejia, who testified that she had reviewed each of the Special Conditions with the Defendant. According to Ms. Mejia, in February 2008 she reviewed with the Defendant the judgment and commitment order, including the three special conditions that the Defendant allegedly violated. (Tr. 25-29; Exh. 4.) The Defendant signed the bottom of the order after the discussion, which took approximately 45 minutes. (Tr. 28; Exh. 4.)

The Defendant's term of supervised release started on March 24, 2008. (Tr. 31.) On March 31, 2008, Ms. Mejia met with the Defendant and again reviewed and signed the judgment and commitment order, reviewed and signed standard conditions, and reviewed and signed the sex offender clarification of specific conditions. (Tr. 31-32; Exh. 5.) The clarification conditions were gone through line by line and, after reading the conditions to the Defendant and discussing the conditions and asking for questions, both Ms. Mejia and the Defendant signed those conditions.[1] (Tr. 33.)

On June 11, 2008, at approximately 5:38 p.m., Ms. Mejia conducted a home visit at the Defendant's apartment. (Tr. 36.) The Defendant was asked if he had used drugs or alcohol, to which he replied no. (Tr. 36.) He was given a Breathalyzer test.[2] (*Id.*) When

---

[1]The government also introduced the transcript of the sentencing hearing, where in pronouncing sentence, Judge Roll imposed as special conditions of supervised release that the Defendant abstain from all use of alcohol or alcoholic beverages and that the Defendant be prohibited from contact with children. (Exh. 3, at p. 31.)

[2]The Defendant requested a continuance to obtain discovery to challenge the results of the Breathalyzer test. Rather than agree to a continuance, the government stated it would not introduce the results of the Breathalyzer test, therefore obviating the need for a continuance.

1  confronted with the results of the test, the Defendant stated that he was suffering from a great
2  deal of financial stress.  Defendant further stated that after he left work he went to a
3  convenience store, noticed that 40 ounce cans of beer were on sale for $1.99, and purchased
4  one.  He then drove home to his apartment complex, went to the community pool and drank
5  the beer.  (Tr. 37.)

6         On June 16, 2008, the Defendant met Ms. Mejia at the Probation Office as directed.
7  There he signed a written admission stating that he drank one can of beer on June 11, 2008.
8  (Tr. 38-40; Exh. 1.)

9         At approximately 2:00 p.m. that same day, Ms. Mejia went to the Defendant's
10 apartment complex and spoke with the apartment manager.  The apartment manager told Ms.
11 Mejia that there were two pools at the apartment complex, the pools were open to all
12 residents and their visitors, and that children frequently use the pools. (Tr. 40-41.)  The
13 apartment policy was that small children were to be supervised, but that did not always
14 happen.  (Tr. 46.) The Defendant told Ms. Mejia that  he had been at the pool between 1:00
15 p.m. and 2:00 p.m. on June 11.  (Tr. 46.)  Ms. Mejia did not observe the Defendant at the
16 pool and did not know if there were children present during that time.  (Tr. 46-47.)

17        At 8:20 p.m. that same evening, Ms. Mejia and another officer visited the Defendant
18 at his apartment to conduct a routine home inspection.  (Tr. 47.)  In his bedroom, the officers
19 discovered a sheet of paper listing the names "Poole, Floyd, and Patton" along with United
20 States Marshal numbers and release dates.  (Tr. 47.)  The Defendant said he did not know
21 why he still had the paper; that the names listed were just people he had met.  (*Id.*)  Ms.
22 Mejia subsequently confirmed with a case manager at FCI Terminal Island that Poole, Floyd,
23 and Patton were felons presently incarcerated at FCI Terminal Island, that the individuals had
24 been incarcerated there with the Defendant, that all three were sex offenders, and that
25 communication between any of them was prohibited.  (Tr. 49-50.)

26        The officers also discovered at the Defendant's apartment an email addressed to the
27 Defendant and written by Walter Edward Floyd while he was an inmate at Terminal Island.
28 (Tr. 48.)  The email reads:

> My Dear Friend, Robert:
> Now, it is DEFINITE! You and I were meant to be together in business. I was just talking about you, to Brandon, and even sent him your information, the night before receiving your "much welcomed" letter. Fate? You better believe it. You know I do. Anyway, I also thank God for the good news regarding your visitation with your Son. And, I will continue to pray for what sounds to be a fragile, yet repairable relationship with your ex-wife. I am also very pleased to hear about the success you have secured with your Probation Officer. Robert, continue to Think, Thank, Talk and Walk Positive, towards the success we discussed while in here. Myography, Inc will be exactly what all of us, as well as our clients, NEED to repair broken lives and strengthen FAMILY VALUES. Everyone was excited that I received your letter, and I have shared it with Dave, Leigh, Christian, and MARK! They love you very much. As for me. I THINK YOU ARE OK TOO . . . . smile" Son. It is what makes life worth living!!!!
>
> Love ya,
> Eddie
> cc/Brandon. . . . see Son, this was meant to be!!!!!

(Exh. 2.) The email is not dated. The post date on the envelope is May 1, 2008. (Tr. 49, 65; Exh. 2.) The envelope was mailed from Reno, Nevada. (Tr. 66.) The Defendant told Ms. Mejia that Walter Floyd's wife received the email in Reno and forwarded it through the mail to the Defendant. (Tr. 66.)

The Defendant told Ms. Mejia that his possession of the document was not a violation because he did not actually receive it via email himself. (Tr. 48.)

## LEGAL STANDARD

18 U.S.C. § 3583(e)(3) and Fed.R.Crim.P. 32.1(b) permit the Court to revoke a term of supervised release and impose a prison term in its stead based upon findings made by a preponderance of the evidence rather than beyond a reasonable doubt.

## ANALYSIS

**1. The government proved by a preponderance of the evidence that the Defendant violated Standard Condition 10.**

Standard Condition 10 required the Defendant to abstain from alcohol. The Defendant was advised of the condition by Judge Roll at the time of sentencing and the condition was reviewed with the Defendant by his Probation Officer. The Defendant signed forms indicating his awareness of the prohibition.

- 4 -

The Defendant admitted to Ms Mejia both orally and in writing that he drank a beer on June 11, 2008. Moreover, he provided a detailed explanation of his alcohol use on that date. Thus, it is clear that the Defendant violated the condition that he abstain from alcohol.

### 2. The government proved by a preponderance of the evidence that the Defendant violated Standard Condition 11.

Standard Condition 11 provides: "You shall not associate . . . with any persons convicted of a felony unless granted permission to do so by the probation officer." The government demonstrated by a preponderance of the evidence that the Defendant violated this condition. The Defendant's term of supervised release began on March 24, 2008. The Defendant received a email from Floyd, a felon, in an envelope postmarked May 1, 2008. Although the email was forwarded by Floyd's wife, it was clearly intended that it be sent to the Defendant. The Defendant remained in possession of the email until it was found on June 16, 2008.

Floyd's email to the Defendant refers to correspondence that the Defendant initiated - specifically a letter that the Defendant sent to Floyd. The email suggests that the Defendant's letter to Floyd was personal in nature as it revealed information about the Defendant's visitation with his son and relationship with his wife. It also suggests that the parties intend a continuing relationship, as noted by the phrase "You and I were meant to be together in business." The fact that Defendant told Ms. Mejia that his possession of the document was not a violation because he did not actually receive it via email himself demonstrates his awareness that the correspondence could be perceived as prohibited.

As indicated in the email, the Defendant's letter revealed to Floyd events occurring after the Defendant's supervisory term began. For example, Floyd's email acknowledges the Defendant's good news regarding visitation with his Son. As defense counsel noted at the hearing, Defendant was not permitted to see his son until the second half of April, 2008. (Tr. 72.) Floyd's email also acknowledges that Defendant has had success with his probation officer. At the evidentiary hearing, the Defendant established through Ms. Mejia, that the Defendant and his probation officer fought over and resolved several issues after his term of

1  supervised release began. Thus, the email demonstrates that the Defendant initiated contact
2  with a person convicted of a felony during his term of supervised release.

3  Defendant asserts that his receiving correspondence from Floyd is not a violation of
4  Standard Condition 11 because that condition prohibits "association," not communication.
5  According to the Defendant, "associate" does not include receiving written correspondence;
6  it involves personal contact. The Magistrate disagrees with the Defendant's limited
7  interpretation of the prohibition on association. The common meaning of the word
8  "associate" is broad. Its definition includes: "to join often in a loose relationship as a
9  partner, fellow worker, colleague, friend, companion, or ally;" "to keep company with;" "to
10 join (things) together or connect (one thing) with another." *Webster's New International*
11 *Dictionary* 132 (3rd Ed. 1993). There is no requirement of physical presence in order for an
12 association to form.

13 Defendant also argued that there was no proof that the correspondence occurred
14 during the Defendant's term of supervised release. However, as explained above, the
15 evidence demonstrated both directly and circumstantially that the Defendant associated with
16 Floyd after the commencement of the term of supervision. Defendant's contact with Floyd
17 was in violation of Condition 11.

**3. The government failed to prove by a preponderance of the evidence that Defendant violated Standard Condition 5.**

The government alleges that Defendant violated Standard Condition 5, which prohibits contact with children, when he when sat by the pool at his apartment complex in the early afternoon on June 11. Special Condition 5 states:

> You shall not have contact with children under the age of 18 without prior permission of the probation officer and shall immediately report to the probation officer any unauthorized contact with children, with the exclusion of the defendant's son and what the probation officer may perceive as any appropriate safeguards.

One of the clarifications of Special Condition 5 provides: "2. You shall not loiter within 100 feet of school yards, parks, playgrounds, arcades, or other places primarily used by children under the age of 18."

- 6 -

Ms. Mejia testified that she told the Defendant that the clarification meant that "places where a reasonable person would believe they would have contact with children were off limits." (Tr. 34.) She also explained that "he was responsible for any – for minimizing any contact with children. If he had any contact, he needed to be the one to leave." (Tr. 35.) He was also responsible for letting the probation officer know immediately if contact with a child did occur. (Tr. 35.) Ms. Mejia acknowledged that children could be present at any location, including restaurants, but indicated that the Defendant was responsible for minimizing that contact and avoiding obvious places where children would be present. For example, he could not go to a McDonald's restaurant and sit in the play land and eat. (Tr. 70.)

There is no evidence that the Defendant had contact with any children at the pool at his apartment complex on June 11, 2008. There is no evidence that children were present at the pool at that time. Nonetheless, the government contends that the Defendant violated Condition 5 because children were likely to be found at the pool and the government introduced evidence that children do in fact frequent the pools at the Defendant's complex.

The fact that children may be present at a pool at the Defendant's place of residence is not sufficient to put the Defendant on notice that he could not ever be present at the pool at his apartment complex regardless of whether there were children there or not. Because there is no evidence that the Defendant had contact with children at the pool on June 11 or failed to minimize contact with children, the Magistrate concludes that the government failed to prove by a preponderance of the evidence that the Defendant violated Special Condition 5.

## RECOMMENDATION

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court accept the Magistrate Judge's findings that the Defendant violated allegations B and C (Standard Conditions 10 and 11) as outlined in the Petition to Revoke Supervised Release. (Doc. No. 27.) The parties have ten (10) days to serve and file written

1 objections to the Report and Recommendation.  The parties are advised that any objections
2 should be filed with the following caption: **CR 06-1277-TUC-JMR.**
3     DATED this 11th day of September, 2008.

           _____
           Jennifer C. Guerin
           United States Magistrate Judge